# United States Court of Appeals
## For the First Circuit

No. 09-1630

MARTIN BOROIAN,

Plaintiff, Appellant,

v.

ROBERT S. MUELLER, III, Director, Federal Bureau of
Investigation; CARMEN P. WALLACE, United States Probation
Officer, U.S. PROBATION OFFICE,

Defendants, Appellees.

APPEAL THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lipez, Howard and Thompson,
Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, Federal
Defender Office, with whom Tamara Fisher was on brief, for
appellant.
Charles W. Scarborough, Appellate Staff, Civil Division,
Department of Justice, with whom Tony West, Assistant Attorney
General, Carmen M. Ortiz, United States Attorney, and Mark B.
Stern, Appellate Staff, Civil Division, Department of Justice, were
on brief, for appellee.

August 11, 2010

**LIPEZ, Circuit Judge**.  In <u>United States</u> v. <u>Weikert</u>, 504 F.3d 1, 3 (1st Cir. 2007), we rejected a supervised releasee's Fourth Amendment challenge to the statutory requirement that he submit a blood sample for purposes of creating a DNA profile and entering it into a centralized government database.  Applying a totality of the circumstances test, we concluded that the extraction of a blood sample and creation of a DNA profile from an individual on supervised release were not unreasonable searches under the Fourth Amendment.  In this case, appellant Martin Boroian poses a question left unanswered in <u>Weikert</u>.  Although acknowledging that the government lawfully obtained his DNA sample and profile during his term of probation, Boroian challenges the government's retention and use of his DNA profile and sample now that he has successfully completed his term of probation.  In particular, he contends that the government's retention and periodic matching of his DNA profile against other profiles in the database is an unreasonable Fourth Amendment search.  He further argues that the analysis of his blood sample is an unreasonable search and contends, for the first time on appeal, that the retention of his blood sample is an unreasonable continuing seizure.

We conclude that the alleged present use of Boroian's DNA profile -- that is, the retention and matching of his lawfully obtained profile against other profiles in the government database

-- does not constitute a search within the meaning of the Fourth Amendment. Boroian has not sufficiently alleged any other present or imminent uses of his DNA profile to support an argument that his profile is being subjected to a new search. We further conclude that he has failed to allege any present or imminent analysis of his DNA sample, thereby providing no factual basis for the argument that a future analysis of his sample would constitute a separate Fourth Amendment search. We do not address his continuing seizure challenge to the retention of his sample, deeming that argument waived. Accordingly, we affirm the dismissal of the complaint for failure to state a claim upon which relief may be granted. See Fed. R. Civ. P. 12(b)(6).

**I.**

**A. Statutory Framework**

The DNA Analysis Backlog Elimination Act of 2000 ("DNA Act"), Pub. L. No. 106-546, 114 Stat. 2726 (2000) (codified as amended in scattered sections of 10 U.S.C., 18 U.S.C., 28 U.S.C. and 42 U.S.C.), requires individuals who have been convicted of "a qualifying Federal offense" and who are incarcerated or on parole, probation, or supervised release to provide government authorities with a DNA sample.[1] 42 U.S.C. § 14135a(a)(1)(B), (a)(2). Although

---

[1] Qualifying federal offenses for mandatory DNA collection include, inter alia, "[a]ny felony." 42 U.S.C. § 14135a(d)(1). Since its enactment, the DNA Act has been amended several times to expand the list of offenses to which it applies. See generally United States v. Kriesel, 508 F.3d 941, 943 & n.3 (9th Cir. 2007)

the extracted DNA sample may be a "tissue, fluid, or other bodily sample," see id. § 14135a(c)(1), it is typically a blood sample, see United States v. Kincade, 379 F.3d 813, 817 (9th Cir. 2004) (en banc).

The DNA Act authorizes the government to use "such means as are reasonably necessary to detain, restrain, and collect a DNA sample from an individual who refuses to cooperate in the collection of the sample." 42 U.S.C. § 14135a(a)(4)(A). A probationer's refusal to comply with the DNA collection procedure is a violation of an express condition of probation, 18 U.S.C. § 3563(a)(9), and is a misdemeanor punishable by up to one year's imprisonment and a fine of up to $100,000, 42 U.S.C. § 14135a(a)(5); 18 U.S.C. §§ 3571, 3581.

Once collected, a qualified federal offender's sample is analyzed by the Federal Bureau of Investigation (FBI) to create a DNA profile. 42 U.S.C. § 14135a(b),(c)(2); Weikert, 504 F.3d at 3. The DNA profile is then loaded into the FBI's Combined DNA Index System (CODIS), a centralized system that includes offender

---

(summarizing amendments to DNA Act). After Boroian filed his complaint in this case, the Act was further expanded to authorize DNA collection not only from convicted individuals, but also "from individuals who are arrested, facing charges, or convicted [of qualifying felonies] or from non-United States persons who are detained under the authority of the United States." See Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 1004(a), 119 Stat. 2960, 3085 (2006) (codified as amended at 42 U.S.C. § 14135a(a)). Boroian does not challenge, and we do not address, the constitutionality of the DNA Act's expanded scope under the 2006 amendments.

profiles obtained through federal, state and territorial DNA collection programs, as well as forensic profiles drawn from crime scene evidence. 42 U.S.C. § 14132(a); Weikert, 504 F.3d at 3-4.[2] CODIS is a three-tiered system linking databases maintained at the local, state, and national level. DNA Initiative, Levels of the Database, http://www.dna.gov/dna-databases/levels (last visited Aug. 5, 2010). Profiles from the local and state databases, as well as profiles collected and analyzed by the FBI, are entered into the national database subject to the requirements of the DNA Act. Id.

CODIS enables law enforcement officials to check if a given profile matches other profiles contained in the national database. See Weikert, 504 F.3d at 4. As of June 2010, the national database contained over 8.4 million offender profiles and over 300,000 forensic profiles, and the FBI credited the system with producing more than 120,000 matches assisting in over 117,000 investigations. See Federal Bureau of Investigation, CODIS-NDIS Statistics, http://www.fbi.gov/hq/lab/codis/clickmap.htm (last visited Aug. 5, 2010). Under the DNA Act, with limited exceptions,[3] the FBI retains qualified federal offenders' DNA

---

[2] CODIS also contains DNA profiles from unidentified remains and from samples voluntarily provided by relatives of missing persons. 42 U.S.C. § 14132(a)(3), (a)(4).

[3] For example, if the FBI receives a certified copy of a final court order establishing that an individual's conviction for the qualifying federal offense has been overturned, the individual's

profiles and DNA samples even after they have completed their term of probation or supervised release.

## B. Factual and Procedural Background

On July 13, 2004, Boroian, a resident of Massachusetts, was convicted in the United States District Court for the District of Vermont of one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2), a qualifying federal offense under the DNA Act. The court sentenced him to one year of probation and imposed a $100 special assessment. On June 8, 2005, about a month before Boroian's term of probation was to expire, the United States Probation Office for the District of Massachusetts ordered him to submit to the drawing of a blood sample for DNA analysis pursuant to the DNA Act.

Shortly before the end of his term of probation, Boroian filed a pro se complaint seeking an order directing defendants to withdraw their demand that he submit to DNA testing. However, not wishing to suffer the adverse consequences of failing to comply with the Probation Office order, he submitted on June 30, 2005, to collection of his DNA sample as required. He successfully completed his term of probation on July 12, 2005.

On March 11, 2008, Boroian, now represented by appointed counsel, filed an amended complaint alleging that under the DNA

---

profile must be promptly expunged from the database. 42 U.S.C. § 14132(d)(1)(A)(i).

Act, his DNA profile and DNA sample would be "retained by the government in perpetuity" for the purpose of "facilitat[ing] . . . the investigation and prosecution of past and future crimes." He claimed that the government's retention and analysis of his DNA profile and sample after completion of his probation term, without reasonable suspicion of criminal activity, violated the Fourth Amendment's prohibition on unreasonable searches and seizures. He sought an order that his DNA profile be expunged and his DNA sample destroyed.

Defendants filed a motion to dismiss Boroian's complaint for failure to state a claim upon which relief could be granted, see Fed. R. Civ. P. 12(b)(6), and the district court granted the motion in a written order. As to Boroian's DNA profile, the court concluded that the government's retention and periodic accessing of his lawfully obtained DNA profile was not a new search within the meaning of the Fourth Amendment. As to his DNA sample, the court held that although a new analysis of the sample could constitute a separate search under the Fourth Amendment, Boroian's complaint contained no factual allegations of a present or imminent analysis of the sample. This timely appeal followed.

**II.**

We review the grant of a motion to dismiss de novo, accepting as true all well-pleaded facts in the complaint and making all reasonable inferences in the plaintiff's favor. Gorelik

v. Costin, 605 F.3d 118, 121 (1st Cir. 2010).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell v. Twombly, 550 U.S. 544, 570 (2007)).  Although not equivalent to "a 'probability requirement,'" the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Twombly, 550 U.S. at 556).

## A.   The Fourth Amendment and Weikert

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend IV.  A Fourth Amendment search occurs when the government infringes "an expectation of privacy that society is prepared to consider reasonable."  United States v. Jacobsen, 466 U.S. 109, 113 (1984); see also Kyllo v. United States, 533 U.S. 27, 33 (2001) (explaining that "a Fourth Amendment search does not occur . . . unless the individual manifested a subjective expectation of privacy in the object of the challenged search and society [is] willing to recognize that expectation as reasonable" (internal quotation marks omitted)).

In Weikert, we rejected a Fourth Amendment challenge to the collection and analysis of DNA samples from qualified federal offenders on supervised release.  Addressing the threshold question

- 8 -

of whether a search or seizure had occurred, we reasoned that the extraction of blood for DNA profiling constituted a search under the Fourth Amendment, and that the creation of the DNA profile and entry of that profile into CODIS represented a further intrusion into the individual's privacy. Id. at 6, 12. Turning to the question of whether the search was reasonable, we recognized the government's "important interests in monitoring and rehabilitating supervised releasees, solving crimes, and exonerating innocent individuals" through the use of CODIS, and concluded that those interests outweighed the individual's privacy interest "given his status as a supervised releasee, the relatively minimal inconvenience occasioned by the blood draw, and the coding of genetic information that, by statute, may be used only for purposes of identification." Id. at 14. Thus, under the totality of the circumstances, we held that neither the extraction of a blood sample nor the creation of a DNA profile and its entry into CODIS was unreasonable under the Fourth Amendment. Id. at 15.

However, we limited our holding in Weikert to the collection and profiling of the DNA of an individual currently on supervised release, emphasizing that supervised releasees have a lesser expectation of privacy than offenders who have completed their term of release. Id. at 15-16. Boroian now poses a question expressly left open in Weikert: whether it is also constitutional for the government to retain and access a qualified federal

offender's DNA profile in CODIS after his or her term of supervised release or probation has ended.  Id. at 3.  We first address Boroian's Fourth Amendment challenge to the government's retention and use of his DNA profile, and then separately address his challenge to the government's retention of his blood sample.

## B. The DNA Profile

### 1.  The Creation and Use of the Profile

Under the DNA Act, DNA profiles currently function as identification records not unlike fingerprints, photographs, or social security numbers.  To create a DNA profile, the FBI uses short tandem repeat (STR) technology to analyze repeating sequences found at thirteen specific regions, or loci, on an individual's DNA.  See Weikert, 504 F.3d at 3; Kincade, 379 F.3d at 818.  Each of the targeted loci are found on "so-called 'junk DNA' -- DNA that differs from one individual to the next and thus can be used for purposes of identification but which was 'purposely selected because [it is] not associated with any known physical or medical characteristics' and 'do[es] not control or influence the expression of any trait.'"  Weikert, 504 F.3d at 3-4 (quoting H.R. Rep. No. 106-900(I), at 27 (2000), 2000 WL 1420163 (letter of Robert Raben, Assistant Attorney General, to the Honorable Henry J. Hyde, Chairman, House Judiciary Committee)).  Thus, the resulting DNA profile "'provide[s] a kind of genetic fingerprint, which uniquely identifies an individual, but does not provide a basis for

determining or inferring anything else about the person.'" Id. at 4 (quoting H.R. Rep. No. 106-900(I), at 27). This genetic fingerprint, represented as a series of digits, see Tracey Maclin, Is Obtaining an Arrestee's DNA A Valid Special Needs Search Under the Fourth Amendment? What Should (And Will) The Supreme Court Do?, 34 J.L. Med. & Ethics 165, 169 (2006), is then loaded into CODIS without any associated information other than "'an agency identifier for the agencies submitting the DNA profile; the specimen identification number; . . . and the name of the DNA personnel associated with the DNA analysis.'" Weikert, 504 F.3d at 4 (quoting H.R. Rep. No. 106-900(I), at 27).

CODIS is a powerful identification and investigation tool, permitting state and local forensic laboratories "to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system." H.R. Rep. 106-900(I), at 8 (2000), 2000 WL 1420163. CODIS is currently used to run a weekly comparison of all DNA profiles in the national database and automatically return the resulting profile matches to the laboratories that submitted them. See United States Dep't of Justice, DNA Initiative, http://www.dna.gov/dna-databases/codis (last visited Aug. 5, 2010).

The DNA Act restricts the use of retained DNA profiles to limited purposes, including by "criminal justice agencies for law

enforcement identification purposes," in judicial proceedings if otherwise admissible, and for criminal defense purposes. 42 U.S.C. § 14132(b)(3).[4] The unauthorized disclosure or use of a DNA profile is punishable by a fine of up to $250,000 or imprisonment of up to one year, id. § 14135e(c), and by cancellation of the user's access to the CODIS database, id. § 14132(c).

## 2. The Reasonable Expectation of Privacy

Given the DNA Act's stringent limitations on the creation and use of DNA profiles, CODIS currently functions much like a traditional fingerprint database, permitting law enforcement to match one identification record against others contained in the database. See, e.g., Johnson v. Quander, 440 F.3d 489, 499 (D.C. Cir. 2006) (CODIS functions "much like an old-fashioned fingerprint database (albeit more efficiently)"); Banks v. United States, 490 F.3d 1178, 1192 (10th Cir. 2007) ("[Statutory] restrictions allow the Government to use an offender's DNA profile in substantially the same way that the Government uses fingerprint and photographic evidence -- to identify offenders, to solve past and future crimes, and to combat recidivism."); Nicholas v. Goord, 430 F.3d 652, 671

---

[4] DNA profiles may also be disclosed "for a population statistics database, for identification research and protocol development purposes, or for quality control purposes," but only after "personally identifiable information" has been removed. 42 U.S.C. § 14132(b)(3)(D). The term "personally identifiable information" is not defined by the statute or implementing regulations, although it presumably means information that could potentially be used to link the DNA profile to the identity of its source, such as, for example, the specimen identification number.

- 12 -

(2d Cir. 2005) ("[W]e see the intrusion on privacy effected by the statute as similar to the intrusion wrought by the maintenance of fingerprint records.").

It is well established that identification records of convicted felons, such as fingerprints or mugshots, are routinely retained by the government after their sentences are complete and may be expunged only in narrowly defined circumstances. See 28 U.S.C. § 534(a) (requiring the Attorney General to "acquire, collect, classify and preserve" criminal identification records (emphasis added)); United States v. Coloian, 480 F.3d 47, 49-50 & n.4 (1st Cir. 2007) (discussing limited grounds for expungement of criminal records); United States v. Amerson, 483 F.3d 73, 86 (2d Cir. 2007) ("[I]t is well established that the state need not destroy records of identification -- such as fingerprints, photographs, etc. -- of convicted felons, once their sentences are up.").

Other precedents hold that the government's matching of a lawfully obtained identification record against other records in its lawful possession does not infringe on an individual's legitimate expectation of privacy. See, e.g., United States v. Diaz-Castaneda, 494 F.3d 1146, 1151-53 (9th Cir. 2007) (running computerized check of individual's lawfully obtained license plate and driver's license identification numbers in government databases, which revealed information about subject's car

ownership, driver status, and criminal record, was not a search under the Fourth Amendment); Willan v. Columbia County, 280 F.3d 1160, 1162 (7th Cir. 2002) (police query of FBI's computerized national crime records database to reveal record of mayoral candidate's earlier conviction in another state was not a Fourth Amendment search).

These long-standing practices and precedents on the retention and matching of offenders' identification records inescapably inform a convicted offender's reasonable expectation of privacy with respect to his or her DNA profile. As with the matching of records in a fingerprint database, the government's use of CODIS to match Boroian's profile against other profiles in the database is limited to a comparison of the identification records already in its lawful possession and does not reveal any new, private or intimate information about Boroian. Moreover, the government's comparison of Boroian's DNA profile with other profiles in CODIS is precisely the use for which the profile was initially lawfully created and entered into CODIS under the DNA Act.

Boroian suggests that the government does not need his DNA profile for "identification" purposes because it already has other means of identification, such as his fingerprints and social security number. However, the fact that the government may lawfully retain and access these more traditional means of

identifying Boroian only emphasizes that the government's retention and matching of his DNA profile does not intrude on Boroian's legitimate expectation of privacy. At present, Boroian's DNA profile simply functions as an additional, albeit more technologically advanced, means of identification.

Therefore, we join the other courts to have addressed the issue in holding that the government's retention and matching of Boroian's profile against other profiles in CODIS does not violate an expectation of privacy that society is prepared to recognize as reasonable, and thus does not constitute a separate search under the Fourth Amendment.[5] See Johnson, 440 F.3d at 499 ("[W]e conclude that accessing the DNA snapshots contained in the CODIS database does not independently implicate the Fourth Amendment."); accord Wilson v. Collins, 517 F.3d 421, 428 (6th Cir. 2008) (stating that claim based on the government's retention and use of DNA profile "does not implicate the Fourth Amendment"); Amerson, 483 F.3d at 86 (acknowledging that offenders' DNA profiles will be retained and "potentially used to identify" offenders after probation terms have ended, but concluding that "we do not believe that this changes the ultimate analysis"); see also Smith v. State, 744 N.E. 2d 437, 440 (Ind. 2001) (holding that the comparison of a lawfully obtained DNA profile with other DNA profiles in government

_____

[5] Boroian does not contend that the retention of his DNA profile constitutes an unreasonable seizure within the meaning of the Fourth Amendment. We therefore do not address that issue.

- 15 -

database does not constitute a separate search under the Fourth Amendment and collecting other state appellate decisions in accord). Boroian has not cited, and our research has not revealed, any decisions holding to the contrary.[6]

### 3. Limitations Of Our Holding

We do not hold, as some courts have suggested, that once a DNA sample is lawfully extracted from an individual and a DNA profile lawfully created, the individual necessarily loses a reasonable expectation of privacy with respect to any subsequent use of that profile. See, e.g., State v. Hauge, 79 P.3d 131, 144 (Haw. 2003) (citing state appellate decisions for the proposition that once a DNA profile has been lawfully procured from an offender, "no privacy interest persists" in the profile); see also Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring) (stating, in challenge to state DNA collection statute, that lawfully obtained DNA sample may be put to various uses because "the fourth amendment does not control how properly collected information is deployed"). Instead, we narrowly hold

---

[6] We acknowledge that portions of Weikert suggested in dicta that the government's retention and periodic matching of a lawfully obtained profile after the offender had completed his term of supervised release would require a rebalancing of the relevant government and privacy interests to determine the reasonableness of the search. See 504 F.3d at 15, 16. That suggestion glossed over the threshold question, noted in Weikert and squarely presented in this case, of whether the government's retention and matching of a lawfully obtained profile even constitutes a Fourth Amendment search. See id. at 16 n.13.

that once a qualified federal offender's profile has been lawfully created and entered into CODIS under the DNA Act, the FBI's retention and periodic matching of the profile against other profiles in CODIS for the purpose of identification is not an intrusion on the offender's legitimate expectation of privacy and thus does not constitute a separate Fourth Amendment search.

We recognize, as we did in Weikert, the possibility that the government may eventually seek to put Boroian's retained DNA profile to uses that go beyond the mere matching of identification records, thereby making the fingerprint analogy less powerful and providing the basis for an argument that a new search has occurred.[7]  For example, "scientific advances might make it possible to deduce information beyond identity from the junk DNA"

---

[7] We made precisely this point in Weikert, where we said that "it may be time to reexamine the proposition that an individual no longer has any expectation of privacy in information seized by the government so long as the government has obtained that information lawfully.  Specifically with reference to DNA profiling, scholars have argued that 'individuals do not lose their privacy interest in [] information merely because the government first obtained [that information] for a valid purpose.  Rather, courts should confront the question of whether the prospective law enforcement use . . . satisfies the reasonableness requirement of the Fourth Amendment.'" 504 F.3d at 16-17 (quoting Harold J. Krent, Of Diaries And Data Banks: Use Restrictions Under the Fourth Amendment, 74 Tex. L. Rev. 49, 94 (1995)) (footnote omitted).  Here we have decided, and only decided, that law enforcement's retention and matching of a qualified federal offender's lawfully obtained DNA profile for identification purposes does not intrude on an objectively reasonable expectation of privacy.  We acknowledge, as we did in Weikert, that "there may be a persuasive argument on different facts that an individual retains an expectation of privacy in the future uses of her DNA profile." Id. at 17.

that forms the thirteen-loci profiles stored in CODIS. Weikert, 504 F.3d at 12-13. Future government uses of the DNA profiles in CODIS could potentially reveal more intimate or private information about the profile's owner and depart from the uses for which the profiles were originally lawfully created and retained.

In this case, however, these are merely hypothetical possibilities. See United States v. Karo, 468 U.S. 705, 712 (1984) ("[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment."). Although Boroian points to ongoing research on the possible functions of so-called junk DNA, he concedes that "none of the genetic markers at the thirteen CODIS loci have, to date, been found predictive for any physical or disease traits." Moreover, as we have described, uses of DNA profiles are restricted by statute to "law enforcement identification purposes" and other limited uses. 42 U.S.C. § 14132(b)(3) (emphasis added). As in Weikert, "the possibility that junk DNA may not be junk DNA some day . . . does not significantly augment [Boroian's] privacy interest in the present case." 504 F.3d at 13.

Although CODIS is designed to conduct comparisons of the profiles in the national database and automatically report exact profile matches, Boroian further argues that in some cases CODIS may report a "partial match." A "partial match" occurs when two profiles are similar but do not match exactly at all thirteen loci.

- 18 -

Because "we share more of our genetic material with biological relatives than with others," a partial match can suggest that the source of a crime scene sample is a close biological relative of the individual whose DNA profile partially matches the crime scene profile. Sonia M. Suter, All in the Family: Privacy and DNA Familial Searching, 23 Harv. J. L. & Tech. 309, 319 (2010). Boroian thus contends that through the process of partial matching, DNA profiles, unlike fingerprints, can be used to reveal biological relationships between individuals.

Arguably, the government's use of CODIS to discover partial matches could raise privacy concerns not raised by a traditional fingerprint database. See, e.g., id. at 342-68 (discussing ways in which partial matching could implicate the privacy interests of both the offender whose profile yields a partial match, and the offender's relatives who could be subjected to law enforcement scrutiny as a result of the partial match). However, we need not address these hypothetical concerns here. To the extent that Boroian seeks to suggest that his own privacy interests are infringed by partial matching, he has not alleged any present or imminent use of CODIS to check his DNA profile for partial matches. He relies solely on a 2006 CODIS Bulletin, which states that the occurrence of a partial match in the national database is "an exceptional event" and that even if a partial match does occur an offender's personally identifiable information may be

- 19 -

disclosed only in narrowly specified circumstances.[8]  The record contains no other information shedding light on how frequently partial matches occur in the national database, exactly what they reveal, or what kind of follow-up investigation is done when a partial match arises.  Thus, any potential invasion of Boroian's privacy due to a partial match with his DNA profile is at this point purely speculative.  To the extent that Boroian seeks to invoke the privacy interests of a familial relation who might someday be subjected to law enforcement scrutiny based on a partial match with Borian's profile, that claim is similarly speculative.

C.  DNA Sample

Separate from the government's ongoing retention and matching of his DNA profile, Boroian challenges the retention of and use of his blood sample.

In the district court, the government moved to dismiss this claim on the ground that Boroian "points to no 'search' of [his DNA sample] that is occurring or even imminent."  Boroian responded in opposition that any future scientific analysis of his blood sample would constitute a separate Fourth Amendment search.  In both its written motion to dismiss and at the hearing on the

_____

[8] Specifically, the 2006 Bulletin states that an offender's identifying information may be released following a partial match only upon written request from the participating laboratory and upon approval from the FBI's Office of the General Counsel and the database custodian, and then only if there is no other available investigative information.

motion, the government conceded that a new scientific analysis of Boroian's stored blood sample would constitute a further Fourth Amendment search. At the hearing, counsel set forth the government's position: "I'm saying that the CODIS search is done, and the CODIS information isn't a new search. If we go and do a new analysis of the DNA, your Honor, it absolutely implicates Fourth Amendment interests and it would need to be rebalanced, but there isn't such a search forthcoming."

On appeal, the government neither repeats nor repudiates that concession. Instead, it emphasizes, as the district court found, that Boroian's complaint does not contain any factual allegations of a present or imminent new analysis of his DNA sample. The government further emphasizes that under the DNA Act, the use and disclosure of stored DNA samples are subject to the same strict limitations as DNA profiles: they may be used only for "law enforcement <u>identification</u>" and other limited purposes,[9] and any unauthorized use or disclosure is subject to substantial criminal penalties. 42 U.S.C. §§ 14132(b)(3) (emphasis added), 14135e(c). In the absence of any factual allegations of abuse, we cannot presume that the government has acted contrary to law and

---

[9] Like DNA profiles, DNA samples may be used only for law enforcement identification purposes, in judicial proceedings, for criminal defense purposes, and, if personally identifiable information is removed, for a population statistics database, identification research and protocol development purposes, or quality control purposes. 42 U.S.C. § 14132(b)(3).

- 21 -

subjected Boroian's sample to new scientific analyses or other unauthorized uses.  On this record, Boroian has failed to state a claim that the government has subjected, or is about to subject, his blood sample to new analyses.  See Johnson, 440 F.3d at 500 (affirming grant of motion to dismiss Fourth Amendment challenge to future use of DNA sample, reasoning that "[n]othing in the record suggests such future testing is imminent, nor can we analyze its invasiveness until it appears").

On appeal, Boroian argues that "the government's retention of Boroian's DNA sample constitutes a continuing suspicionless seizure" under the Fourth Amendment and that this seizure is "separate and apart from the question of whether an additional search of the seized materials has occurred or will occur."  However, Boroian did not present this "continuing seizure" theory in his opposition to the motion to dismiss in the district court, and he may not unveil it for the first time on appeal.[10]  See Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most

---

[10] Boroian contends that the "continuing seizure" argument is not waived because his counsel made this argument at the hearing on the motion to dismiss.  However, the continuing seizure argument was entirely absent from Boroian's opposition to the motion to dismiss and was made only in passing at the hearing without any citation to authority.  This brief reference, made only at the hearing, does not suffice to squarely raise the argument before the district court.

extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."). We see no reason to deviate from that well-established principle here.[11]

### III.

We conclude that Boroian has failed to state a claim that either his lawfully obtained DNA sample or his lawfully created DNA profile has been subjected to a new Fourth Amendment search. The government's retention and matching of Boroian's DNA profile against other profiles in CODIS for the purpose of identification does not invade an expectation of privacy that society is prepared to recognize as reasonable. Boroian has not sufficiently alleged

---

[11] We note that Boroian has sought the expungement of his sample only on Fourth Amendment grounds. He has not moved for the return of his DNA sample under Federal Rule of Criminal Procedure 41(g), which provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." (Emphasis added). See Jason Tarricone, Note, "An Ordinary Citizen Just Like Everyone Else": The Indefinite Retention of Former Offenders' DNA, 2 Stan. J. Civ. Rts. & Civ. Liberties 209, 247 (2005) ("It could be argued that ex-felons whose physical DNA sample remains in police custody should have a right to petition for its return [under Rule 41(g)], as that sample (as opposed to the DNA profile) is no longer necessary for crime-solving purposes.") (citing Krent, supra, at 65-66). Nor has Boroian moved to expunge his sample on constitutional grounds other than the Fourth Amendment, although some commentary has suggested that there may be other paths. See Leigh M. Harlan, Note, When Privacy Fails: Invoking A Property Paradigm To Mandate the Destruction Of DNA Samples, 54 Duke L. J. 179, 180 (2004) (citing concerns expressed by DNA database opponents about the constitutionality of DNA sampling under the Fifth and Fourteenth Amendments, among others). We express no view on the viability of such claims.

any other present or imminent uses of his DNA profile to support an argument that a new search of his profile is being conducted. He also has not alleged any present or imminent new analysis of his DNA sample, and therefore he has no factual basis for arguing here that a new scientific analysis of his stored DNA sample would constitute a separate Fourth Amendment search.

Affirmed.